IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| RACHEL ARMSTRONG, | No. 83587-4-I |
| Appellant, | |
| v. | DIVISION ONE |
| TANYA CARTER, | UNPUBLISHED OPINION |
| Respondent, | |
| DOES I-IV, unknown persons, | |
| Defendants. | |

SMITH, A.C.J. — Tanya Carter negligently collided with Rachel Armstrong's vehicle, which Armstrong alleged caused serious and sustained injuries. A jury awarded Armstrong $37,000 in economic and noneconomic damages. Armstrong appeals, contending that the trial court erred by (1) refusing to instruct the jury on future economic damages, (2) compelling Armstrong to take a CR 35 examination, (3) excluding an expert witness, and (4) granting Carter an offset for previous insurance payments.

We agree with Armstrong that the trial court erred when it refused to instruct the jury on future economic damages, despite Armstrong introducing lay and expert testimony of impaired earning capacity. We also agree that the trial court erred when it offset the verdict because Carter failed to introduce evidence establishing facts upon which relief can be granted. We therefore reverse in part.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

In December 2015, Rachel Armstrong was driving northbound along State Route 203 in King County approaching the intersection between Route 203 and Faye Road. Tanya Carter was stopped at this intersection on the east side of Route 203, waiting to turn left onto the route to travel southbound. She did so, and Armstrong's vehicle struck the driver's side of Carter's car.

Armstrong sued Carter for negligent operation of her motor vehicle. Armstrong alleged that Carter's negligence caused Armstrong to endure serious and sustained injuries. She claimed that she suffered physical injuries including lower back, neck, and shoulder pain, tightness in her muscles, a herniated disc, whiplash, lack of energy, and migraines, much of which remained present years after the collision. She also claimed to have traumatic brain injury stemming from the incident that had permanently affected her ability to focus and multitask and otherwise handle cognitive tasks. She pleaded past and future economic damages including medical expenses and lost earning capacity, along with non-economic damages including discomfort and anguish, emotional pain and suffering, and loss of enjoyment of life.

Carter admitted to negligence but contested the extent of Armstrong's injuries and corresponding damages. The case proceeded to jury trial on this issue. Armstrong rested her case-in-chief after almost seven full days of testimony. She called a combination of lay and expert witnesses. The lay witnesses were mainly her employers, coworkers, and medical providers, who testified to her capabilities before and after the collision, her hopes to advance to

2

higher pay for more intellectually challenging work, and her treatment after the incident. She also called three expert witnesses. Dr. Martha Glisky, a neuropsychologist, testified about Armstrong's cognitive capacities and her diagnosis of mild neurocognitive disorder. Dr. Erin Bigler, another neuropsychologist, testified similarly and to the likely permanency of Armstrong's cognitive impairments. And Merrill Cohen, a vocational consultant, testified about the impacts of these impairments on Armstrong's future professional opportunities.

Toward the end of her case-in-chief, two days before trial was scheduled to conclude and with Carter having yet to put on any testimony, Armstrong gave notice of her intent to call another witness, Dr. Richard Batson, one of her medical providers. Carter moved to exclude this testimony as untimely, and the court granted the motion.

At the close of trial, the court declined to instruct the jury on Armstrong's claims of lost earning capacity. The jury returned a verdict of $12,000 for past economic damages and $25,000 for past and future non-economic damages.

After trial, Carter asked the court to reduce this verdict by $10,000. She claimed that her insurer, State Farm Mutual Automobile Insurance Company (State Farm), had previously paid Armstrong's insurer, Pemco Mutual (PEMCO), that amount at intra-company arbitration. That payment, she asserted, had been made as reimbursement to PEMCO for money it had provided to Armstrong to cover her post-collision medical costs. Armstrong did not submit a reply, and the court did not treat Carter's response as a motion and issue a briefing schedule.

3

After waiting several days, but still without input from Armstrong, the trial court granted Carter's request for an offset, reducing the final judgment to $27,000.

Armstrong appeals.

ANALYSIS

Armstrong assigns error to four of the trial court's decisions. First, she asserts that the trial court's refusal to instruct the jury on damages related to her lost earning capacity was an abuse of discretion in the face of evidence indicating ongoing cognitive difficulties after the collision. Second, she challenges the trial court's decision to grant a motion from Carter allowing one of Carter's experts to conduct a neurological examination of her. Third, she contends that the trial court's exclusion of Dr. Batson was improper. Finally, she claims that the court erred in offsetting her judgment by $10,000.

We conclude that the trial court did not err in permitting the CR 35 neurological examination or in excluding Dr. Batson. Good cause existed supporting the examination because Armstrong placed her physical and mental condition in dispute through her requested damages. And Dr. Batson's exclusion was warranted because the remaining time for trial—which included the entirety of the defendant's case-in-chief—was limited to less than two days, and Armstrong had waited nearly a week to give last-minute notice of her intent to call him.

However, we agree that the court erred in its refusal to instruct on lost earning capacity and that the offset of the judgment was improper. Ample evidence supported Armstrong's requested lost earning capacity instruction,

4

including both lay and expert testimony about her potential future earnings and decreased capacity. And Carter's request for an offset was unsupported by sufficient evidence, especially because she failed to provide copies of any relevant insurance contract.

Lost Earning Capacity

Armstrong challenges the trial court's failure to instruct the jury on her claims of future economic damages based on her impaired earning capacity.[1] We agree that the trial court erred in denying this requested instruction.

Armstrong claims that "[t]here appears to be some confusion among the courts on the standard of review for the failure to give a requested instruction." But the standard of review is well established, though it hinges on the distinction between whether the trial court should give an instruction in the first place, and whether an instruction that has already been given adequately represents the law. In the latter circumstance, the "court reviews de novo the alleged errors of law in a trial court's instructions to the jury." Barrett v. Lucky Seven Saloon, Inc., 152 Wn.2d 259, 266, 96 P.3d 386 (2004). Where, however, the question is not whether a given instruction correctly stated the law but instead whether the underlying factual dispute warranted giving an instruction on a party's theory at all, abuse of discretion applies. Fergen v. Sestero, 182 Wn.2d 794, 802, 346 P.3d 708 (2015). Here, where the trial court refused to give an instruction on the plaintiff's theory of damages, we review for an abuse of discretion.

---

[1] Cases use a variety of terms—including "lost earning capacity," "impaired earning capacity," and "future earning capacity."

Discretion is abused when the trial court's decision is "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." Associated Mortg. Investors v. G.P. Kent Constr. Co., 15 Wn. App. 223, 229, 548 P.2d 558 (1976). A decision is based on untenable grounds or made for untenable reasons if it relies on facts unsupported in the record or applied the wrong legal standard. State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2003). If the court applies the proper legal standard to supported facts, its decision may still be manifestly unreasonable if no reasonable person would adopt it. State v. Lewis, 115 Wn.2d 294, 298-99, 797 P.2d 1141 (1990).

    1. Future Economic Damages Instruction

Within that framework, "[j]ury instructions are generally sufficient if they are supported by the evidence, allow each party to argue its theory of the case, and when read as a whole, properly inform the trier of fact of the applicable law." Fergen, 182 Wn.2d at 803. On the other hand, instructions are insufficient and the trial court abuses its discretion when the court refuses to give an instruction despite its proponent presenting sufficient evidence to support it. Stiley v. Block, 130 Wn.2d 486, 498, 925 P.2d 194 (1996).

Cases have defined the quantum of evidence sufficient to require an instruction differently. Some say that "[a] trial court is required to instruct the jury on a theory only where there is *substantial* evidence to support it." E.g., Stiley, 130 Wn.2d at 498 (emphasis added). Others say that "[e]ach party is entitled to have [their] theory of the case presented to the jury, if there is *any* evidence to support it." E.g., Woods v. Goodson, 55 Wn.2d 687, 689, 349 P.2d 731 (1960)

(emphasis added). Addressing this inconsistency, our Supreme Court recently held that "regardless of the terms used, the quantum of proof justifying an instruction on a party's theory of the case is *some* evidence supporting the proposition." State v. Arbogast, 199 Wn.2d 356, 370, 506 P.3d 1238 (2022) (emphasis added). Arbogast clarified that the ultimate "concern is allowing the jury to speculate on an issue not supported by evidence." 199 Wn.2d at 370.

Here, Armstrong contends that the trial court erred when it refused to instruct the jury on her theory that she was owed future economic damages because her injuries impaired her potential earnings over the course of the remainder of her life. Washington classifies lost earning capacity as a form of economic damages. See RCW 4.56.250(1)(a) (defining economic damages as "objectively verifiable monetary losses" including "loss of earnings"). Generally, "[w]here a permanent injury has been established and plaintiff proves that [they] were] unable to work as well as [they] could before the accident and suffers pain while [they are] working, [they are] entitled to compensation for impairment of earning capacity." Leak v. U.S. Rubber Co., 9 Wn. App. 98, 105, 511 P.2d 88 (1973). Concerning burden of proof: "Once the *fact* of damage is established the *amount* need not be shown with mathematical certainty." State v. Mark, 36 Wn. App. 428, 434, 675 P.2d 1250 (1984). " 'Evidence of damage is sufficient if it affords a reasonable basis for estimating loss and does not subject the trier of fact to mere speculation or conjecture.' " Clayton v. Wilson, 168 Wn.2d 57, 71-72, 227 P.3d 278 (2010) (quoting Mark, 36 Wn. App. at 434).

It does not appear that Washington appellate courts have addressed a situation in which reversal is required because the trial court erroneously failed to instruct a jury on future economic damages based on lost earning capacity. Instructively, however, they have often affirmed trial court decisions to instruct juries on such damages even when the evidence proffered is relatively scant. For instance, in Murray v. Mossman, evidence was sufficient for such an instruction where a secretary who had experienced loss of sensation in her arm and hand had more difficulty typing and writing shorthand, an assertion supported only by the testimony of an eyewitness coworker. 52 Wn.2d 885, 889-90, 329 P.2d 1089 (1958).

Here, Armstrong presented considerably more testimony than the single lay witness presented in Murray. Before and after her collision, Armstrong was employed as an office manager by Edward Jones, a financial planning company. Her employers and coworkers testified that after the collision, her ability to perform tasks dependent on memory, processing, and focus decreased. Before the collision, she relied heavily on her memory, rarely taking notes or needing reminders to perform certain tasks. After the collision, that changed; she began to forget names and struggled to recall how to perform her responsibilities. Because she completed some tasks more slowly than before, her employer hired a new employee to assist. According to testimony from Eva Gremmert—a tax professional for whom Armstrong worked part-time in addition to her work at Edward Jones—the length of time it took Armstrong to complete certain tasks increased by around 50 percent.

In addition to lay testimony, Armstrong offered the expert testimony of Dr. Martha Glisky, a neuropsychologist. Dr. Glisky conducted a neuropsychological evaluation on Armstrong, attempting to determine her pre- and post-collision levels of cognitive and emotional functioning. Dr. Glisky determined that Armstrong's mental abilities had likely been permanently degraded in several respects—specifically her ability to sustain attention and multitask—and concluded that she met the diagnostic criteria for mild neurocognitive disorder.

Lay and expert testimony tied these alleged deficiencies to Armstrong's future earning capacity. The lay testimony, from Armstrong, her friends, and her coworkers, established her long-standing plans to either return to school or assume more remunerative and intellectually demanding responsibilities at Edward Jones. Merrill Cohen, a vocational consultant, testified that these plans were no longer reasonable given Armstrong's cognitive difficulties. Cohen testified that the difference between Armstrong's current income and her potential income as a financial adviser was between $20,000 and $40,000 annually. She also commented on how unlikely it would be that Armstrong remained employed by Edward Jones for the next 25 years until she reaches retirement age, and emphasized that Armstrong's existing pay at Edward Jones was more than twice the market rate for the work she was qualified for.

This summary of the testimony about Armstrong's goals, injuries, and impaired ability is not exhaustive. Armstrong called other lay and expert witnesses, including Dr. Erin Bigler, a specialist in neuropsychological behavior

and cognitive testing who testified that Armstrong's cognitive defects were likely permanent.

We conclude that, given this extensive testimony, Armstrong is correct that the trial court erred in refusing to give a future economic damages instruction based on Armstrong's lost earning capacity. Armstrong introduced evidence tending to show (1) that she intended to pursue a more remunerative profession, (2) that she had the ability to do so before the collision, (3) that the collision had negatively impacted her ability to pursue those more remunerative professions by causing lasting cognitive impairment, and (4) that her likely future earnings were thereby reduced. This is significantly more than the quantum of evidence found sufficient to affirm a future economic damages instruction in Murray, which required only a single lay-witness co-worker. 52 Wn.2d at 889-90. And it more than meets Arbogast's requirement that the proponent of an instruction present "some evidence" supporting their theory of a case to be entitled to an instruction. 199 Wn.2d at 370.

Even where instructions contain error, reversal is not warranted unless that error is prejudicial, meaning it affects the outcome of the trial. Stiley, 130 Wn.2d at 498-99. Here, it is. Armstrong correctly cites to Lofgren v. Western Washington Corporation of Seventh Day Adventists for the proposition that failure to instruct on a theory of damages where that theory is substantially supported by evidence is prejudicial. 65 Wn.2d 144, 151, 396 P.2d 139 (1964).

10

### 2. Remedy on Remand

We must now decide whether to remand for retrial only to determine future economic damages, or whether to order retrial on those and past and future *non*-economic damages. Because future economic damages are not distinct and separable from past and future non-economic damages in this case, we remand for retrial on both.

We "may reverse, affirm, or modify the decision being reviewed and take any other action as the merits of the case and the interest of justice may require." RAP 12.2. We may therefore limit the scope of issues that are remanded for retrial. Mina v. Boise Cascade Corp., 104 Wn.2d 696, 707, 710 P.2d 184 (1985). But "[a] limitation of issues on retrial should only be imposed where the issue to be retried is so distinct and separable from the other issues that a trial of that issue alone can take place without injustice or complication." Lahmann v. Sisters of St. Francis of Philadelphia, 55 Wn. App. 716, 724, 780 P.2d 868 (1989). Applying this principle in Mina, the court limited retrial to the issue of liability, rather than liability and damages, when: (1) the special verdict form contained separate questions relating to liability and damages; (2) the jury was specifically instructed on the issue of damages; and (3) damages were not challenged on appeal. 104 Wn.2d at 707-08. The courts' ultimate concern is that the parties have had a "full and fair opportunity" to present evidence on the scope of liability. Mut. of Enumclaw Ins. Co. v. Gregg Roofing, Inc., 178 Wn. App. 702, 727–28, 315 P.3d 1143 (2013).

Here, the special verdict form allowed the jury to separately award (1) past economic damages, (2) future economic damages, and (3) past and future non-economic damages. But because the court declined to instruct on lost earnings capacity, Jury Instruction No. 12 did not direct the jury to consider future economic damage elements. Plaintiff's counsel, in closing, emphasized "the impairment on the ability for [Anderson] to enjoy life and for the pain and the suffering she's been through and will continue to go through." But, perhaps because of the limited scope of instructed damages, plaintiff's counsel did not mention lost future earnings capacity in closing argument. See CR 51 (indicating a party should address the jury on the evidence and the law as contained in the court's instructions). See also Riley v. Dep't of Labor & Indus., 51 Wn.2d 438, 319 P.2d 549 (1957) (affirming trial court's grant of retrial when counsel presented an issue to the jury that was not submitted to the jury).

Here, the plaintiff did not have a full and fair opportunity to present evidence on the scope of non-economic damages when plaintiff's counsel was essentially prohibited from speaking on how the loss of future earnings would influence the plaintiff's quality of life. The jury was instructed to consider "[the] loss of enjoyment of life" and "pain and suffering" as elements of non-economic damages; insecurity about one's future financial stability falls under these elements. Because the court's refusal to instruct on lost earning capacity limited Anderson's ability to discuss all elements of non-economic damages, we remand for retrial on both future economic damages and past and future non-economic

12

damages; the two forms of damages are not "distinct and separable" in this instance.

CR 35 Examination

In preparation for trial, Carter moved to conduct a neurological examination on Armstrong to investigate the extent of her claimed ongoing mental difficulties. The court permitted the examination. Armstrong now challenges the propriety of that order, contending that Carter, who did not present expert testimony, failed as a matter of law to establish that good cause existed to conduct the examination. We disagree.

CR 35 governs how parties may conduct physical and mental examinations of persons as a part of the discovery process. In contrast to many other forms of discovery, which do not require prior approval from the courts,[2] the trial court acts as a gatekeeper when one side wishes to examine another party or a person under the custody or control of that party. CR 35(a)(1). The court may permit examination "on motion for good cause shown" in circumstances where the physical or mental condition of the examinee is "in controversy." CR 35(a)(1). Because CR 35 was based on an equivalent federal rule, Federal Rule of Civil Procedure (FRCP) 35, and because their requirements, and particularly their "good cause" and "in controversy" requirements, are very

---

[2] See, e.g., CR 30 (allowing for depositions in most instances without prior approval); CR 33 (allowing for service of interrogatories without prior approval); CR 34 (allowing for production of documents without prior approval).

similar, Washington courts may rely on federal precedent interpreting FRCP 35. In re Welfare of Green, 14 Wn. App. 939, 942, 546 P.2d 1230 (1976).[3]

The burden is on the moving party to demonstrate both that the condition of the examinee is in controversy and that good cause exists supporting the particular examination sought. Green, 14 Wn. App. at 942-43. In many instances, this means the movant must bring forth information to support their request, but it may also be the case that the pleadings alone suffice to meet the "in controversy" and "good cause" requirements. Green, 14 Wn. App. at 943 (citing Schlagenhauf v. Holder, 379 U.S. 104, 118-19, 85 S. Ct. 234, 13 L. Ed. 2d 152 (1964) (interpreting FRCP 35)). Green affirmed the trial court's granting of a CR 35 motion to conduct the psychological examination of a mother where her mental state was the basis for the State's attempt to terminate her parental rights. 14 Wn. App. at 943-44. It held that the petition for termination, along with a motion alleging the mother was "incapable" and that examination was therefore necessary, sufficed to meet CR 35's requirements. 14 Wn. App. at 943-44.

CR 35 does not explicitly establish requirements for precisely what sort of testimony or evidence suffices to demonstrate good cause. It leaves that determination to the trial court and, as a result, decisions to grant or deny CR 35

---

[3] CR 35's "good cause" and "in controversy" requirements may at times overlap or be confused, but they are not identical. Federal cases interpreting FRCP 35 demonstrate this principle. Where an examination is needlessly duplicative, for instance, good cause may be difficult to show even though the health of the examinee is in controversy. Brennan v. Thomas, 780 F. App'x 813, 819 (11th Cir. 2019). And defendants may remove an issue from controversy by agreeing to the plaintiff's representation of their injuries, defeating what would otherwise have been a motion supported by good cause. Grogan v. Kumar, 873 F.3d 273, 280-81 (5th Cir. 2017).

motions are reviewed for abuse of discretion. Beagle v. Beagle, 57 Wn.2d 753, 756, 359 P.2d 808 (1961). Here, however, Armstrong does not appear to directly challenge whether good cause existed to order her examination as a factual matter. Instead, she contends that CR 35's good cause requirement must, as a matter of law, be met through expert testimony, and that the trial court erred when it granted Carter's CR 35 motion without such testimony. We therefore review her claims de novo. See State v. Stump, 185 Wn.2d 454, 458, 374 P.3d 89 (2016) ("The interpretation of a court rule presents a question of law that we review de novo.").

The CR 35 motion at issue was brought by Carter and joined by PEMCO, at that point an intervening defendant in the case. It aimed to compel a neurological examination of Armstrong. Carter supported her motion by reference to Armstrong's claims of injury caused by the collision and lasting indefinitely, including lower back pain, neck and spine pain, herniated disc, shoulder pain, whiplash, tightness in muscle/tissue, headaches/migraines, traumatic brain injury, and lack of energy. While Armstrong's complaint had alleged lasting harms, Carter's CR 35 motion references Armstrong's interrogatory responses, which provided greater detail about the extent and nature of those ongoing injuries. It also referenced Armstrong's deposition, in which she testified to chronic head, neck, knee, lower back, and hip pain, as well as headaches and migraines. Armstrong's claims of both past and future economic and non-economic damages were based on these lasting injuries. Carter's motion did not rely on any sort of expert testimony.

15

We hold that CR 35 does not require expert testimony to establish good cause. CR 35 does not make expert testimony an explicit requirement to show good cause. " 'In construing a statute, it is safer always not to add to, or subtract from, the language of the statute unless imperatively required to make it a rational statute.' " State v. Taylor, 97 Wn.2d 724, 728, 649 P.2d 633 (1982) (quoting McKay v. Dep't of Labor & Indus., 180 Wash. 191, 194, 39 P.2d 997 (1934)). Similarly, "[the courts] cannot read into a statute that which [they] may believe the legislature has omitted, be it an intentional or an inadvertent omission." Taylor, 97 Wn.2d at 728 (quoting Jenkins v. Bellingham Mun. Court, 95 Wn.2d 574, 579, 627 P.2d 1316 (1981)). Here, where case law already establishes that both the "in controversy" and "good cause" requirements of CR 35 can be met based on the pleadings alone, it is not an error of law to grant a CR 35 motion unsupported by expert testimony. For this reason, the trial court did not err. It may very well be that there are instances in which good cause must be established through medical testimony, but it does not follow that expert testimony is necessary in all cases.

Armstrong cites a number of cases in her attempt to assault this idea, but none is relevant. She cites Berger v. Sonneland for the notion that medical facts must typically be established by expert testimony, but that case concerned the wholly different procedural posture of sufficiency of evidence at summary judgment to support a medical malpractice claim. 144 Wn.2d 91, 110-11, 26 P.3d 257 (2001). She similarly cites Patterson v. Horton, 84 Wn. App. 531, 929 P.2d 1125 (1997), to establish that expert testimony is required to show that

medical treatment is necessary. But Patterson concerned the form of evidence sufficient to sustain an award of damages, not CR 35. 84 Wn. App. at 543. Armstrong then quotes liberally from a concurrence to In re Detention of Williams in which Justice Chambers expresses "grave concern" that CR 35 examinations not be allowed too liberally, given their inherently invasive nature. 147 Wn.2d 476, 495-499, 55 P.3d 597 (2002). This concurrence has no precedential value. Additionally, Williams concerned whether the State could invoke CR 35 in petitions to civilly commit sexually violent predators consistent with the commitment chapter, 71.09 RCW, which already set out a different examination procedure. 147 Wn.2d at 491. It did not concern the scope of CR 35's good cause requirements. Finally, Armstrong cites Volkert v. Fairbank Construction Company, which concerned under what circumstances expert reports containing medical information are subject to disclosure limitations under Washington's Uniform Health Care Information Act, ch. 70.02 RCW; despite arising in the discovery context, it did not concern the scope of CR 35. 8 Wn. App. 2d 399, 401, 438 P.3d 1203 (2019). None of these cases aids our interpretation of CR 35, and we therefore conclude that the trial court did not err when it granted Carter's CR 35 motion.

### Exclusion of Dr. Batson

Armstrong next challenges the trial court's decision to exclude the testimony of Dr. Richard Batson, one of Armstrong's medical providers. We conclude that the trial court did not abuse its discretion when it excluded Dr. Batson.

17

Discovery sanctions are usually discretionary on the part of the trial court, and reviewed for an abuse of that discretion. Teter v. Deck, 174 Wn.2d 207, 216, 274 P.3d 336 (2012). "We give wide latitude to a trial court in fashioning an appropriate sanction for discovery abuse." Barton v. Dep't of Transp., 178 Wn.2d 193, 215, 308 P.3d 597 (2013).

"If a party . . . fails to obey an order to provide or permit discovery . . . the court in which the action is pending may make such orders in regard to the failure as are just." CR 37(b)(2). CR 37 lists a number of potential sanctions for discovery violations, including prohibiting the introduction of designated matters into evidence. CR 37(b)(2)(B). It thereby serves as a source of authority for the trial court to exclude certain witnesses from testifying. Burnet v. Spokane Ambulance, 131 Wn.2d 484, 494, 933 P.2d 1036 (1997).

Relevant here are discovery orders issued under King County Local Court Rule (KCLR) 4, which lays out certain disclosure requirements that parties must obey before trial. Among them, parties must file a joint statement of evidence (JSOE) at least five days before trial including the names of all witnesses the parties expect to call. KCLR 4(k). KCLR 4(e)(2) adds that failure to adhere to the rule's requirements may lead to CR 37(b)(2) sanctions.[4] The JSOE filed here did not include Dr. Batson. Also relevant, KCLR 4(j) requires a witness list to be filed before trial including the witnesses whom the filing party expects to call. It states "[a]ny witness or exhibit not listed may not be used at trial, unless the

---

[4] This language is included under the form Case Schedule Order laid out in KCLR 4(e)(2). No such case order has been designated as part of the record in this case, but it is referenced throughout the record.

18

Court orders otherwise for good cause and subject to such conditions as justice requires." KCLR 4(j). Dr. Batson does not appear on the witness and exhibit list filed by Armstrong on April 9, 2021, the last such list she filed before trial. The trial court also granted a defense motion in limine, ordering that witnesses be disclosed at least 24 hours in advance.

Generally, because the purpose of the civil rules is to encourage resolution of cases on their merits to the greatest degree possible, "the court may impose only the least severe sanction that will be adequate to serve its purpose in issuing a sanction." Teter, 174 Wash.2d at 216. "The purposes of sanctions are to deter, punish, compensate, educate, and ensure that the wrongdoer does not profit from the wrong." Barton, 178 Wn.2d at 215.

Particularly strict requirements therefore bind trial courts' attempts to exclude witnesses. When a trial court seeks to do so, it must make findings concerning: (1) whether the discovery violation was willful or deliberate; (2) whether it substantially prejudiced the opposing party's attempts to prepare for trial; and (3) whether lesser sanctions would probably suffice. Jones v. City of Seattle, 179 Wn.2d 322, 338, 314 P.3d 380 (2013). Findings concerning these factors—named the "Burnet" factors after the case in which they originated— must be made on the record, but may be made either orally or in writing. Teter, 174 Wn.2d at 217.

Here, Armstrong presented her case-in-chief over the course of seven trial days before the court heard argument about whether Dr. Batson should be allowed to testify. Armstrong's counsel represented to the court that they had

assumed that Dr. Batson's testimony would not be required until another of her witnesses, Dr. Phillip Milam, referenced some of Dr. Batson's records at trial. Dr. Milam had testified on June 3. But Armstrong did not disclose her intent to call Dr. Batson until Monday, June 8, when she expressed a desire to call him either the following Tuesday or Wednesday.

Carter argued that this delay indicated willfulness. She further asserted that, because Tuesday, June 9 was planned as the last day of Armstrong's case-in-chief and because the next day was planned as the final day of trial for reasons of juror availability, she was severely prejudiced her opportunity to prepare and present her own case. These scheduling limitations, argued Carter, also ensured that no lesser sanction would suffice; any time hearing testimony from Dr. Batson would subtract an equal amount of time from Carter's ability to present her case.

The trial court found that Armstrong should have disclosed her intent to call Dr. Batson on Wednesday, June 3rd rather than waiting until the following Monday, a day before his intended testimony. It found that this delay prejudiced the defense significantly, and found that no lesser sanction would suffice.

We conclude that the trial court did not abuse its discretion in excluding Dr. Batson. The trial court's findings are minimal, but the record supports them. Armstrong waited until the eve of Carter's case-in-chief, itself truncated because of juror scheduling issues, to request that a last minute, undisclosed witness be allowed to testify. The delay of several days between the time Armstrong's counsel reported they anticipated having to call Dr. Batson and their disclosure

20

supports a determination of willfulness. And the extraordinarily limited time left to trial adequately supports the trial court's conclusion that Carter was prejudiced, and that no lesser sanction would suffice.

Offset of Judgment

Armstrong finally challenges the trial court's decision to offset the final verdict, reducing it from $37,000 to $27,000, because of Carter's claims that her insurer, PEMCO, had already paid Armstrong's insurer, State Farm, $10,000. Because Carter did not meet her evidentiary burden, we agree that the trial court erred.

### 1. Legal Standards Concerning Offsets

An offset is a reduction in the amount of a judgment because the judgment debtor has already partially or wholly paid the judgment creditor as compensation for the debtor's underlying fault. Eagle Point Condo. Owners Ass'n v. Coy, 102 Wn. App. 697, 701-02, 9 P.3d 898 (2000). It serves the equitable purpose of preventing a plaintiff from doubly recovering their damages from the tortfeasor. Eagle Point, 102 Wn. App. at 702. "When the party seeks an offset against a judgment, [they] must show that [they] paid in the manner alleged, and that [they are] entitled to have the payment credited against the obligation embodied in the judgment." Maziarski v. Bair, 83 Wn. App. 835, 841, 924 P.2d 409 (1996). Factual elements supporting the offset must be affirmatively proven. See Lange v. Raef, 34 Wn. App. 701, 707, 664 P.2d 1274 (1983) (reversing offset award because defendant failed to factually demonstrate double recovery warranting offset).

21

Offsets are made complicated by the way in which they interact with the terms of insurance contracts. If an insurer made a payment per the terms of an insurance policy on the insured tortfeasor's behalf to an injured party, the tortfeasor may take advantage of that payment to claim an offset against a judgment the injured party obtains against the tortfeasor. Maziarski, 83 Wn. App. at 841 n. 8.[5] Additionally, insurance contracts may provide that an insurer can be reimbursed by their own insured for any amount the insurer had previously paid to the insured that is later compensated through a judgment against a tortfeasor. Hamm v. State Farm Mut. Auto. Ins. Co., 151 Wn.2d 303, 309, 88 P.3d 395 (2004).

It is also the case that more than one insurance policy establishing a right to compensation can be in place between an insured and their insurer. For instance, insured individuals may have both fault-based and non-fault-based policies simultaneously providing coverage. Maziarski, 83 Wn. App. at 837. Where they do, those policies may allow an injured individual to recover under both. Maziarski, 83 Wn. App. at 842-43. Here, it appears that Armstrong had both.

Importantly, then, where payments between insurance companies and their insureds are involved, rights to offset or reimbursement may depend on the

---

[5] Ordinarily, a tortfeasor may not receive credit for a payment to the injured party compensating for the injury when that payment comes from a third party; this is the "collateral source rule." Lange, 34 Wn. App. at 704. The rule does not apply, however, where the source of the payment is a fund, such as insurance, created by the tortfeasor to make such payments. Lange, 34 Wn. App. at 704.

exact provisions of the relevant insurance policies. It was because the relevant policies were not introduced into evidence that the Maziarski court reversed the trial court's decision to offset. 83 Wn. App. at 844-46.

### 2. Standard of Review

We generally review "a trial court's decision to grant an offset for abuse of discretion." Eagle Point, 102 Wn. App. at 701. Here, however, the procedural posture by which this issue reaches us affects the scope of review. Carter's request for an offset was made by way of response to Armstrong's notice of presentation of judgment. The record does not indicate that Armstrong ever replied or objected to this response, and she does not allege that she did. Nor did the trial court treat this response as its own motion and issue a new briefing schedule. Instead, on the basis solely of Carter's response, the trial court awarded the offset.

Because no objection was made below to the form of the proceedings or to the evidence attached to Carter's response, Armstrong has only preserved what issues can be appealed under RAP 2.5(a). Armstrong makes no claims of lack of jurisdiction or manifest error affecting a constitutional right.

Because we do not elect to review her unpreserved claims per our discretion, her only recourse on appeal is therefore RAP 2.5(a)(2), which allows appeal for "failure to establish facts upon which relief can be granted" even when that error was not raised in the trial court. "Traditionally, this provision . . . has been the basis for considering initially on appeal a challenge to the prevailing party's evidence due to failure to establish some element of its case." State v.

23

Clark, 195 Wn. App. 868, 874-75, 381 P.3d 198 (2016).  We therefore scrutinize whether Carter met her burden of proof to provide evidence that established the elements of her offset claim.

    3.  <u>Whether Carter was Entitled to an Offset</u>

Carter's claim to an offset is based on a settlement payment of $10,000 she asserts her insurer, PEMCO, made to Armstrong's insurer, State Farm, at arbitration before trial.  Carter asserts that State Farm in turn paid $10,000 of Armstrong's medical expenses per her personal injury protection policy, that the payment between insurers was to account for this, and it is through this chain of payments—and, implicitly, through a mixture of equitable and contractual rights—that Armstrong owes Carter an offset.  Supporting this allegation is the declaration of Thomas J. McPherson, Carter's attorney, employed by State Farm.  There, he declares under oath that all factual statements contained within her response are true and correct "to the best of my knowledge and belief."

Attached to McPherson's declaration are two exhibits.  The first is what appears to be, and what McPherson says is, a screenshot of the software interface enabling access to the docket for the arbitration proceeding that resulted in State Farm paying PEMCO $10,000.  Under the heading "Decision Information" are statements apparently written by a panelist, Patricia Dibonaventura.  The minimal information included confirms that State Farm admitted liability because "State Farm made a left hand turn into PEMCO when it was unsafe to do so."  The docket also indicates that PEMCO proved $10,000 in damages by submitting adjuster notes, a ledger, medical bills, and records.  The

docket then describes a $10,000 award of damages by the arbitrator. Elsewhere in the exhibit, where authorship is less apparent, Armstrong and Carter are both mentioned and the $10,000 claim is specified to fall under service dates "from December 2015 to July 2016." The second exhibit attached to McPherson's declaration is an endorsed check for $10,000, made out from State Farm to PEMCO on behalf of Tanya Carter.[6]

The evidence submitted by McPherson does not establish crucial elements of Carter's offset claim. First, McPherson provided neither a copy of Armstrong's insurance contract with PEMCO, nor Carter's with State Farm. Because Carter's claim to an offset is dependent on the $10,000 State Farm paid on her behalf to PEMCO, and in turn on PEMCO's prior payment to Armstrong under the terms of her policy, crucial links in the evidentiary chain are missing: (1) proof that PEMCO was entitled to reimbursement from Carter, and (2) proof that the payment between insurers could appropriately be credited as a payment from State Farm to Carter herself.

Second, it is far from clear that the $10,000 can all be credited against the $12,000 the jury awarded for past economic damages. In Lange, where all awarded damages in the jury's verdict were general, no court was in the position to "ascertain the different damages components of the jury's award to properly credit the [insurance] payments against the general verdict." 34 Wn. App. at 706.

---

[6] The bulk of this evidence would likely be inadmissible as hearsay or lacking proper foundation were objections to be made. See, e.g., ER 801, 802 (statements made by a person other than the one asserting their truth in court are not typically admissible). Here, they were not.

Similarly, here, no special verdict form established precisely what expenses constituted the past economic damages the jury awarded. Assuming the screenshot of the arbitration docket is trustworthy, the insurance coverage only compensated Armstrong for costs assumed between December 2015 and July 2016. But the only particularized dollar amounts referenced at trial were for chiropractic treatment that began in 2017, amounting to roughly $5,000. We have not been provided exhibits admitted at trial as a part of the record on appeal, but the exhibit list indicates only seven admissions, none of them bills for any other past economic expenses. Given this, while the exact basis for the jury's $12,000 past economic damages award is unclear, it is reasonable to assume that at least $5,000 of it was for chiropractic treatment that occurred outside the span of time in which insurance paid for Armstrong's medical bills. But without some more specific factual finding indicating otherwise, it is possible that the *entirety* of the past economic damages award was for costs not compensated through the policy payments.[7]

Given the above, we conclude that Carter did not meet her burden to demonstrate entitlement to an offset.

---

[7] Additionally, even assuming that Carter's evidence established the elements of her claim to an offset, it also suffers from numerous deficits that no reasonable fact-finder could ignore. For one, McPherson was employed by State Farm to represent Carter, but purported to testify about the existence of otherwise unsubstantiated payments between PEMCO and Armstrong, an obvious credibility issue. Additionally, the arbitration docket does not so much as assert that the arbitrator reviewed Armstrong's insurance policy. And to the extent that the arbitrator's final order would be relevant to determining whether Carter is entitled to an offset—itself uncertain, since McPherson's response to the notice of presentation contains no argument or citation to authority—its summary in the docket is insufficient.

We vacate the final judgment and reverse and remand for retrial on future economic damages and past and future non-economic damages, and then for entry of a new judgment without an offset.

Smith, A.C.J.

WE CONCUR: